**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **CARY WEIGAND, CHERYL SCHMIDT and CALVIN SCHMIDT, individually, and on behalf of a class of similarly situated persons,** | ) ) ) ) ) | JURY TRIAL DEMANDED |
| ***Plaintiffs*,** | ) ) | |
| **v.** | ) ) | Civil Action No. _____ |
| **GROUP 1001 INSURANCE HOLDINGS, LLC; GROUP 1001 RESOURCES, LLC; CLEAR SPRING LIFE AND ANNUITY COMPANY; -and- DELAWARE LIFE INSURANCE COMPANY** | ) ) ) ) ) ) ) ) ) | |
| ***Defendants*.** | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, CAREY WEIGAND ("Plaintiff Weigand"), CHERYL SCHMIDT ("Plaintiff Cheryl Schmidt"), and CALVIN SCHMIDT ("Plaintiff Calvin Schmidt") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants, GROUP 1001 INSURANCE HOLDINGS, LLC, GROUP 1001 RESOURCES, LLC (collectively "Group 1001"), CLEAR SPRING LIFE AND ANNUITY COMPANY ("Clear Spring"), and DELAWARE LIFE INSURANCE COMPANY ("Delaware Life") (collectively, "Defendants") and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, members, and/or other related entities, and upon personal knowledge as to their own actions, and information and belief as to all other matters, allege as follows:

1

## INTRODUCTION

1.      This action arises out of the public exposure of the confidential, personal information of Defendants' current, former and prospective customers and employees, and employee dependents, Personally Identifying Information [1] ("PII") (hereinafter, "Private Information"), including Plaintiffs and the proposed Class Members, on or about February 9, 2023, and as early as November 30, 2022, during a ransomware cyberattack to Defendants' systems, caused by Defendants' collective failures to adequately safeguard that information ("the Data Breach").[2]

2.      According to Defendants, the Private Information unauthorizedly disclosed in the Data Breach includes customers' and/or employees' (and their dependents') names, addresses, dates of birth, Social Security numbers, and contract/policy numbers[3] as well as their financial account numbers or credit/debit card numbers (in combination with security code, access code,

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendants, not every type of information included in that definition was compromised in the Data Breach.

[2] *See*: "Group 1001 Resumes Full Operations After Ransomware Attack," March 1, 2023, available at https://www.group1001.com/news/group-1001-resumes-full-operations-after-ransomware-attack (last accessed August 15, 2023), **attached as Exhibit A**;
       Clear Spring Life and Annuity Company, "Notice of Data Breach," Cary Weigand, July 28, 2023, **attached as Exhibit B**;
       Clear Spring Life and Annuity Company, "Notice of Data Breach," Cheryl Schmidt, July 28, 2023, **attached as Exhibit C**;
       Delaware Life Insurance Company, "Notice of Data Breach," Calvin Schmidt, July 28, 2023, **attached as Exhibit D**;
       Group 1001 Resources LLC, sample Notice of Data Breach, July 28, 2023, available at https://apps.web.maine.gov/online/aeviewer/ME/40/fce1bd8e-b164-458e-bb3d-42b5dcaeb0a4.shtml  **attached as Exhibit E.**
[3] *See*: "Notice of Data Breach," Ex. B; "Notice of Data Breach," Ex. C; "Notice of Data Breach," Ex. D.

password or pin for the account)[4], and their Driver's License Numbers or Non-Driver Identification Card Numbers, passport number, insurance, and other benefits information, such as the names of dependents and beneficiaries.[5]

3.      Based in Zionsville, Indiana, Group 1001 "is an insurance holding company [which] through its subsidiaries, provides an array of protection and wealth accumulation products, such as annuities, life insurance, and property and casualty insurance."[6]

4.      Group 1001's subsidiaries and "insurance brands" include Defendants Clear Spring Life and Annuity Company ("Clear Spring"), and Defendants Delaware Life Insurance Company ("Delaware Life"), through whom Defendants provide life and annuity insurance products to customers.[7]

5.      As a condition of purchasing an annuity contract or life insurance policy from Group 1001, Clear Spring, and/or Delaware Life, Defendants required their customers and prospective customers to provide them with their sensitive Private Information, which Defendants promised to protect from unauthorized disclosure.

6.      In addition, as a condition of employment, Defendants required prospective employees and employees to provide them with their Private Information, which Defendants promised to protect from unauthorized disclosure.

7.      Defendants failed to undertake adequate measures to safeguard the Private

---

[4] See Clear Spring Notice to Maine Attorney General, July 27, 2023, avail. at https://apps.web.maine.gov/online/aeviewer/ME/40/5f16f55f-42b7-458f-a916-2603c9f83bb7.shtml (last acc. Aug. 15, 2023)

[5] *See* Group 1001 Data Breach Notification to Maine Attorney General, July 28, 2023, avail. at https://apps.web.maine.gov/online/aeviewer/ME/40/fce1bd8e-b164-458e-bb3d-42b5dcaeb0a4.shtml (last acc. Aug. 15, 2023).

[6] Group 1001 Privacy Policy, avail. at https://www.group1001.com/legal/ (last acc. Aug. 15, 2023).

[7] *See* https://www.group1001.com/careers (last acc. Aug. 15, 2023).

Information of Plaintiffs and the proposed Class Members, including failing to implement industry standards for data security, and failing to properly train employees on cybersecurity protocols, resulting in the Data Breach.

8.      Although Defendants purportedly discovered the Data Breach on February 9, 2023, they uniformly failed to immediately notify and warn current, former, and prospective customers and employees who were victimized in the breach, waiting until July 28, 2023 to send written notice to Plaintiffs and the Class Members.[8]

9.      As a direct and proximate result of Defendants' failures to protect current, prospective, and former customers' and employees' sensitive Private Information and warn them promptly and fully about the Data Breach, Plaintiffs and the proposed Class Members have suffered widespread injury and damages necessitating Plaintiffs to seek relief on a class wide basis.

## PARTIES

10.     Plaintiff Weigand is a natural person and resident and citizen of the State of Oregon, residing in Bandon, Coos County, Oregon, where she intends to remain. Plaintiff is a customer of Clear Spring and Group 1001 and a Data Breach victim.

11.     Plaintiff Cheryl Schmidt is a natural person and resident and citizen of the State of Minnesota, residing in Cold Spring, Stearns County, Minnesota, where she intends to remain. Plaintiff is a customer of Clear Spring, Delaware Life, and Group 1001 and a Data Breach victim.

12.     Plaintiff Calvin Schmidt is a natural person and resident and citizen of the State of Minnesota, residing in Cold Spring, Stearns County, Minnesota, where he intends to remain. Plaintiff is a customer of Delaware Life, Clear spring, and Group 1001 and a Data Breach victim.

---

[8] *See*: "Notice of Data Breach," Ex. B; "Notice of Data Breach," Ex. C; "Notice of Data Breach," Ex. D.

13.     Defendant Group 1001 Insurance Holdings, LLC, is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 10555 Group 1001 Way, Zionsville, Indiana, 46077.

14.     On information and belief, Defendant Group 1001 Resources, LLC, is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 10555 Group 1001 Way, Zionsville, Indiana, 46077, which manages Group 1001 Insurance Holdings, LLC's workforce (Defendants Group 1001 Insurance Holdings, LLC and Group 1001 Resources, LLC are collectively referred to as "Group 1001").

15.     On information and belief, Clear Spring is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 10555 Group 1001 Way, Zionsville, Indiana 46077.

16.     Delaware Life is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1601 Trapelo Road, Suite 30, Waltham, Massachusetts 02451, and, upon information and belief, with an office located at 10555 Group 1001 Way, Zionsville, Indiana 46077.

17.     As follows, Clear Spring and Delaware Life are subsidiary companies of Group 1001. On information and belief, Defendants are all *alter egos* of one another.

**JURISDICTION & VENUE**

18.     This Court has personal jurisdiction over Defendants Group 1001 and Clear Spring because each operates, conducts, engages in, or carries on a business in Indiana, and each maintains a principal place of business in this State.

19.     This Court has personal jurisdiction over Defendant Delaware Life because it operates, conducts, engages in, or carries on a business in this State; caused personal injury or

property damage by an act or omission done within this state or caused personal injury or caused personal injury or property damage in this state by an occurrence, act or omission done outside this state while regularly doing business in this state; by having supplied or contracted to supply services rendered in this state; and by owning, using, or possessing any real property within this state.

20.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred (100) members in the proposed Class, and at least one member of the class is a citizen of a state different from Defendants.

21.     The Court has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367.

22.     Venue is proper under 28 U.S.C. § 1391(b) because Defendants Group 1001 and Clear Spring reside in this district and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## BACKGROUND FACTS

### A.  Defendants, Group 1001, Clear Spring, and Delaware Life

23.     Group 1001 holds itself out as a "technology-driven financial services company with a mission to empower our customers, employees, and communities by making innovative products accessible to everyone [; and] striv[ing] to demystify how insurance and annuity products are purchased today by leveraging technology to provide intuitive financial solutions for all Americans."[9]

24.     Group 1001 provides financial products and services to customers such as

---

[9] https://www.group1001.com/ (last acc. Aug. 15, 2023)

annuities, life insurance, and property and casualty insurance through its subsidiary companies, including Clear Spring and Delaware Life.[10]

25.    As Group 1001 explains, the relationship between it and its subsidiary companies, Clear Spring and Delaware Life, is as follows:



[11]

26.    Indeed, Clear Spring states that it is "a Delaware-domiciled life insurance company that is a subsidiary of Group 1001 Insurance Holdings, LLC, which, along with its affiliates, does business under the name, Group 1001."[12]

27.    Clear Spring offers a financial products, namely annuities such as ClearFlex Fixed Indexed Annuity, ViStar Fixed Indexed Annuity, Highlander Fixed Indexed Annuity, Highlander 7 Fixed Indexed Annuity, Preserve Multi-Year Generational Annuity, and the Provider Single Premium Immediate Annuity.[13]

---

[10] https://www.group1001.com/#companies; https://www.group1001.com/careers/
[11] https://www.group1001.com/careers
[12] Clear Spring, "Terms and Conditions," avail. at https://clearspringlife.com/terms-conditions
[13] https://clearspringlife.com/products

28.     Likewise, according to Delaware Life, "[f]ounded in 2013, [it] is a member of Group One Thousand One, LLC ("Group1001"): A dynamic network of businesses making insurance more useful, logical and accessible for everyone."[14]

29.     Delaware Life specializes in "retirement services and helping people achieve their long-term financial goals,"[15] offering annuity products including fixed asset annuities (Growth Pathway Fixed Index Annuity, Retirement Stages Select, Target Income 10, and Target Growth 10), as well as Multi-year Guaranteed Fixed Annuities, and Variable Annuities.[16]

30.     As of December 2022, Delaware Life managed total assets of $41.2 billion with over 334,000 annuity and life insurance policies.[17]

31.     As a condition of receiving Defendants' annuity services, Group 1001, Clear Spring, and Delaware Life each require that their customers and employees provide Defendants with their Private Information, including their names, addresses, dates of birth, Social Security numbers, and contract/policy numbers, as well as their financial account numbers or credit/debit card numbers, and their Driver's License Numbers or Non-Driver Identification Card Numbers, passport number, insurance, and other benefits information, such as the names of dependents and beneficiaries.

32.     Defendants collect and store this Private Information on their information technology computer systems, on information and belief located at 10555 Group 1001 Way, Zionsville, Indiana 46077.

33.     Defendants promise customers and prospective customers and employees that they will take adequate measures to safeguard their Private Information.

---

[14] https://www.delawarelife.com/home (last acc. Aug. 15, 2023).
[15] https://www.delawarelife.com/content/our-story (last acc. Aug. 15, 2023).
[16] https://www.delawarelife.com/our-products/all-annuities-page (last acc. Aug. 15, 2023).
[17] https://www.delawarelife.com/home (last acc. Aug. 15, 2023).

34.     On information and belief, Group 1001 maintains policies concerning the privacy of the Private Information it collects from customers and prospective customers, including that it will use this information only for certain purposes, none of which include the Data Breach, and in which it represents having technical safeguards designed to protect their Private Information.

35.     Clear Spring maintains a Privacy Policy ("Clear Spring Privacy Policy"), which applies "…to information we collect via Clear Spring Life websites or online services that display or link to this Notice (the "Services"). This Notice also applies to communications you may have with us."[18]

36.     In its Privacy Policy, Clear Spring informs customers and prospective customers that:

> We collect personal information from you when you use our Services and interact with us. The information we collect includes: any information you choose to provide us, such as first and last name, account name, address, Social Security number, contact information (e.g., telephone number) and any interest you may express in our products and services. In some circumstances, we may be required to collect information such as government-issued ID and proof of address. We may also collect information relating to:
> - Records and copies of your correspondence (including email addresses and audio recordings of calls placed to our customer service representatives), if you contact us.
> - Your responses to surveys, such as those that we might ask you to complete for research purposes.
> - Details of potential transactions or transactions you carry out through us or financial products and services you purchase, including financial information.[19]

37.     Clear Spring's Privacy Policy provides enumerated purposes for which it may use customers' Private Information, including providing services to customers, responding to inquiries, and for business purposes including authenticating identities and access to accounts;

---

[18] Clear Spring Privacy Policy, Effective January 1, 2021, available at https://clearspringlife.com/privacy-policy (last acc. Aug. 15, 2023), **attached as Exhibit F.**
[19] *Id.*

"Initiating, facilitating, processing, and/or executing transactions; Responding to your requests and questions; Communicating with you regarding your account or any Services you use; Performing creditworthiness, fraud prevention or other similar reviews; Evaluating applications; Comparing information for accuracy and verification purposes; Managing our business and protecting ourselves, you, other persons, and the Services; Providing a personalized experience and implementing your preferences; Better understanding our customers and how they use and interact with the Services; Complying with our policies and obligations, government orders, legal advice or legal process; Establishing, exercising or defending our legal rights where it is necessary for our legitimate interests or the legitimate interests of others; Resolving disputes, collecting fees, or troubleshooting problems; and Providing customer service to you or otherwise communicating with you[;] and to "fulfill the purposes for which you provide it, or with your consent." [20]

38.     None of the purposes for which Clear Spring is permitted to use customer's Private Information under its Privacy Policy include the Data Breach.

39.     Further, in its Privacy Policy, Clear Spring explicitly states that it has "implemented administrative, physical and technical safeguards designed to protect your personal information."[21]

40.     Delaware Life maintains a Privacy Policy ("Delaware Life Privacy Policy"), in which it states:

> At Delaware Life, protecting your privacy is important to us. Whether you are an existing customer or considering a relationship with us, we recognize that you have an interest in how we may collect, use and share information about you. **We understand and appreciate the trust and confidence you place in us, and we take seriously our obligation to maintain the confidentiality and security of your personal information.** We invite you to review this Privacy Policy which outlines how we use and protect that information.[22]

---

[20] *Id.*

[21] *Id.*

[22] Delaware Life Privacy Policy, avail. at https://www.delawarelife.com/static/documents/DLIC-Privacy-Policy.pdf (last acc. Aug. 15, 2023) (emphasis added), **attached as Exhibit G.**

41.     In its Privacy Policy, Delaware Life represents to customers and prospective customers that:

> Collecting personal information from you is essential to our ability to offer you high-quality investment, retirement and insurance products. When you apply for a product or service from us, we need to obtain information from you to determine whether we can provide it to you. As part of that process, we may collect information about you, known as nonpublic personal information, from the following sources:
> • Information we receive from you on applications or other forms, such as your name, address, social security number and date of birth;
> • Information about your transactions with us, our affiliates or others, such as other life insurance policies or annuities that you may own; and
> • Information we receive from a consumer reporting agency, such as a credit report.[23]

42.     Delaware Life's Privacy Policy states that "[o]nce we obtain nonpublic personal information from you, we do not disclose it to any third party except as permitted or required by law...[;]" and provides certain enumerated purposes for which it may share this Private Information with third parties, including "to companies that help in conducting our business or perform services on our behalf" in which case it  "require[s] them to comply with strict standards regarding the security and confidentiality of our customers' nonpublic personal information[;] when complying with federal, state or local laws, when responding to a subpoena, or when complying with an inquiry by a governmental agency or regulator."[24]

43.     In its Privacy Policy, Delaware Life goes onto represent and promise customers that, "[w]e maintain physical, electronic and procedural safeguards that comply with federal and state regulations to safeguard your nonpublic personal information from unauthorized use or improper access."[25]

44.     Moreover, Delaware Life's Privacy Policy states that it will not disclose nonpublic

---

[23] *Id.*
[24] *Id.*
[25] *Id.*

Private Information to non-affiliated third parties even after the customer relationship ends.[26]

45.     None of the purposes for which Delaware Life is permitted to disclose customer's Private Information under its Privacy Policy includes the Data Breach.

46.     Despite their representations to employ adequate safeguards to protect customers' Private Information, including as set forth in their privacy policies and, Defendants do not follow industry standard practices in securing that information stored in their information technology systems.

**B. Defendants Fail to Safeguard Customers' and Employees' Private Information**

47.     On or about February 9, 2023, and possibly as early as November 30, 2022, unauthorized third party cybercriminals were able to access the systems of Defendants, Group 1001, Clear Spring, and Delaware Life, during a ransomware cyberattack and acquire the Private Information of current, former, and prospective customers, and employees (and dependents), including their names, addresses, dates of birth, Social Security numbers, contract/policy numbers, as well as their financial account numbers or credit/debit card numbers (in combination with security code, access code, password or pin for the account), and their Driver's License Numbers or Non-Driver Identification Card Numbers ("the Data Breach").[27]

48.     The Data Breach was the result of Defendants' collective failures to safeguard the Private Information of its current, former, and prospective customers and employees, including by failing to utilize industry standard data security measures, and failing to properly train employees

---

[26] *Id*.

[27] *See* Clear Spring Notice of Data Breach, Cary Weigand, Exhibit B; Clear Spring Notice of Data Breach, Cheryl Schmidt, Exhibit C; Delaware Life Notice of Data Breach, Calvin Schmidt, Exhibit D; Clear Spring Data Breach Notification to Maine Attorney General, July 27, 2023, available at https://apps.web.maine.gov/online/aeviewer/ME/40/5f16f55f-42b7-458f-a916-2603c9f83bb7.shtml (last acc. Aug. 15, 2023); Group 1001, sample Notice of Data Breach, July 28, 2023, avail. at https://apps.web.maine.gov/online/aeviewer/ME/40/fce1bd8e-b164-458e-bb3d-42b5dcaeb0a4.shtml.

on cybersecurity protocols.

### i. Group 1001 Website Notice of the Data Breach

49.     On March 1, 2023, Group 1001 posted a notice on its website ("Website Notice"), stating that it was providing an update as to the Data Breach experienced by Defendants, *to wit*, "concerning recent system interruptions experienced by certain Group 1001 Insurance member companies, including Delaware Life Insurance Company, Delaware Life Insurance Company of New York, Clear Spring Life and Annuity Company, Clear Spring Property and Casualty Company, and our Clear Spring Health business."[28]

50.     The Website Notice stated that "[b]eginning on February 9, 2023, we were alerted to the existence of sophisticated ransomware on our information technology infrastructure," after which it "immediately launched an investigation to determine the full scope of the incident, and a team of third-party forensic experts was engaged to assist in the investigation…"[29]

51.     Group 1001's Website Notice went onto state that after discovering the Data Breach, it:

-   We took immediate action by proactively disconnecting systems from our network to contain the threat and prevent additional systems from being affected.

-   Along with our forensics experts, our team scanned systems for indicators of compromise and remediated any identified indicators of compromise.

-   In addition, we deployed additional advanced endpoint detection and monitoring tools on our newly restored systems for an added layer of security and visibility across our network.

-   All systems were validated as clean by conducting additional scans

---

[28] "Group 1001 Resumes Full Operations After Ransomware Attack," March 1, 2023, available at https://www.group1001.com/news/group-1001-resumes-full-operations-after-ransomware-attack (last accessed August 15, 2023), **Exhibit A**.
[29] *Id*.

before they were brought back online.

- We have been, and continue to be, in communication with our regulators about this incident.

- There will be a number of other infrastructure enhancements to continuously strengthen the security posture of Group 1001's network and systems in the days, months, and years ahead.[30]

52.     The Website Notice too informed stakeholders that it has notified the Federal Bureau of Investigation of the Data Breach, that it did not pay a ransom, and stating that, "[t]he security of our information and that of our contract holders and other stakeholders is important to us. Once our investigation is complete, we will notify any impacted parties as appropriate."[31]

53.     On or about July 27, 2023, Clear Spring reported the Data Breach to the Maine Attorney General, reporting that the Data Breach occurred on February 9, 2023, and was discovered that day; that it occurred by an "external system breach (hacking)" and ransomware attack; that 4,393 persons were affected; and that the information acquired included "Name or other personal identifier in combination with: Financial Account Number or Credit/Debit Card Number (in combination with security code, access code, password or PIN for the account)."[32]

54.     On or about July 28, 2023, Group 1001, as "Group 1001 Resources, Inc." or "Group 1001 Resources, LLC," reported the Data Breach to the Maine Attorney General, reporting that the Data Breach occurred beginning on November 30, 2022; was discovered on February 9, 2023; involved an external system breach (hacking) attack; and that the information acquired included *employees'* and dependents' "Name[s] or other personal identifier in combination with: Driver's

---

[30] *Id.*

[31] *Id.*

[32] Clear Spring Data Breach Notification to Maine Attorney General, July 27, 2023, available at https://apps.web.maine.gov/online/aeviewer/ME/40/5f16f55f-42b7-458f-a916-2603c9f83bb7.shtml

License Number[s] or Non-Driver Identification Card Number[s]"[33] and/or passport number, insurance, and other benefits information, such as the names of your dependents and beneficiaries.[34]

55.     On information and belief, the Data Breach that was reported as occurring on February 9, 2023 involving Clear Spring and the Data Breach to Group 1001's systems from November 30, 2022 to February 9, 2023 was the same event impacting the Private Information of Defendants' prospective, current, and former customers and employees.

56.     Despite discovering the Data Breach on February 9, 2023, Clear Spring and Delaware Life waited until July 28, 2023, to begin sending written notification to prospective, current and former customers impacted by the Data Breach.

57.     Likewise, despite discovering the Data Breach on February 9, 2023, Group 1001 waited until July 28, 2023, to begin sending written notification to prospective, current and former employees impacted by the Data Breach.

### ii.  Clear Spring's Data Breach Notice

58.     On or about July 28, 2023, Clear Spring began sending written notification of the Data Breach to affected current, former, and prospective customers associated with an annuity or life insurance contract, stating that:

> On February 9, 2023, we were alerted to the existence of sophisticated ransomware on our information technology infrastructure. We immediately took steps to isolate and secure our systems and investigate the incident. We retained a leading third-party forensics firm to conduct a thorough investigation, secure our systems, remediate any risks, and methodically bring our systems back online once such systems were validated as clean. We also alerted appropriate regulatory authorities and the Federal Bureau of investigation.[35]

---

[33] Group 1001 Data Breach Notification to Maine Attorney General, July 28, 2023, available at https://apps.web.maine.gov/online/aeviewer/ME/40/fce1bd8e-b164-458e-bb3d-42b5dcaeb0a4.shtml (emphasis added).
[34] Id., sample Data Breach Notice, July 28, 2023.
[35] Clear Spring Data Breach Notice to Cheryl Schmidt, Ex. B; Clear Spring Data Breach Notice

59.     Clear Spring's Data Breach Notice went onto explain that its investigation determined that in the Data Breach discovered on February 9, 2023, "an unauthorized malicious actor accessed and acquired certain files from our systems," which after further investigation completed on July 10, 2023 was determined to involve Private Information which "differ[ed] from individual to individual but may have included" their names, addresses, dates of birth, Social Security numbers, and contract/policy numbers."[36]

60.     In its Data Breach Notice, Clear Spring further stated that they had "scanned our systems for, and remediated, any identified indicators of compromise[;'" and "deployed additional advanced endpoint detection and monitoring tools on our newly restored systems for an added layer of security and visibility across our network[;]" and would continue to make infrastructure enhancements.[37]

61.     Clear Spring's Data Breach Notice went on to state it had not "identified any suspicious activity pertaining to your associated annuity contract or life insurance policy and [had] not received any reports of misuse of your information," but nevertheless encouraged Data Breach victims to be "vigilant and closely review and monitor [] financial accounts, statements, credit reports, and other financial information for any evidence of unusual activity, fraudulent charges, or signs of identity theft."[38]

62.     Clear Spring's Data Breach Notice likewise apprised Data Breach Victims of their abilities to put a fraud alert or security freeze on their credit files.[39]

---

to Cary Weigand, Ex. C.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

63.     Further, in the Data Breach Notice, Clear Spring offered affected victims two (2) years of identity theft protection services through IDX.[40]

64.     Clear Spring's Data Breach Notice was signed by Robert Stanton, labeled as the Chief Operating Officer of Clear Spring. In reality,

### iii.  Delaware Life's Data Breach Notice

65.     As with Clear Spring, on or about July 28, 2023, Delaware Life began sending written notification of the Data Breach to affected current, former, and prospective customers associated with an annuity or life insurance contract, which contained almost identical content as the Clear Spring Data Breach Notice.[41]

66.     Indeed, Delaware Life stated, verbatim to Clear Spring's Data Breach Notice, stated:

> On February 9, 2023, we were alerted to the existence of sophisticated ransomware on our information technology infrastructure. We immediately took steps to isolate and secure our systems and investigate the incident. We retained a leading third-patty forensics firm to conduct a thorough investigation, secure our systems, remediate any risks, and methodically bring our systems back online once such systems were validated as clean. We also alerted appropriate regulatory authorities and the Federal Bureau of Investigation.[42]

67.     Likewise, Delaware Life's Data Breach Notice went onto explain that "an unauthorized malicious actor [had] accessed and acquired certain files from our systems," which after further investigation completed on July 10, 2023 was determined to involve Private Information which "differ[ed] from individual to individual but may have included" their names, addresses, dates of birth, Social Security numbers, and contract/policy numbers."[43]

---

[40] *Id*.
[41] *See* Delaware Life Insurance Company, "Notice of Data Breach," Calvin Schmidt, July 28, 2023, Exhibit D;
[42] *Id*.
[43] *Id*.

68.     In its Data Breach Notice, Delaware Life further stated that they had "scanned our systems for, and remediated, any identified indicators of compromise[;]" and "deployed additional advanced endpoint detection and monitoring tools on our newly restored systems for an added layer of security and visibility across our network[;]" and would continue to make infrastructure enhancements.[44]

69.     Delaware Life's Data Breach Notice went on to state it had not "identified any suspicious activity pertaining to your associated annuity contract or life insurance policy and [had] not received any reports of misuse of your information," but nevertheless encouraged Defendants' Data Breach victims to be "vigilant and closely review and monitor [] financial accounts, statements, credit reports, and other financial information for any evidence of unusual activity, fraudulent charges, or signs of identity theft."[45]

70.     Delaware Life's Data Breach Notice likewise apprised Data Breach Victims of their abilities to put a fraud alert or security freeze on their credit files.[46]

71.     Further, in the Data Breach Notice, Delaware Life offered affected victims two (2) years of identity theft protection services through IDX.[47]

### iv.   Group 1001's Data Breach Notice

72.     Further, on or about July 28, 2023, Group 1001 (Group 1001 Resources, LLC) began sending written notification of the Data Breach to affected employees, former employees, job applicants, or spouses, dependents, or beneficiary of an employee or former employee.[48]

---

[44] *Id*.
[45] *Id*.
[46] *Id*.
[47] *Id*.
[48] *See* Group 1001 Resources, LLC, sample Notice of Data Breach, July 28, 2023, available at https://apps.web.maine.gov/online/aeviewer/ME/40/fce1bd8e-b164-458e-bb3d-42b5dcaeb0a4.shtml, **attached as Exhibit E.**

73.     In verbatim language to both Clear Spring's and Delaware Life's Data Breach Notices, Group 1001 explained in its Data Breach Notice that, "[o]n February 9, 2023, we were alerted to the existence of sophisticated ransomware on our information technology infrastructure…[etc.]"[49]

74.     As with the prior data breach notices, Group 1001's Data Breach Notice went onto explain that "an unauthorized malicious actor [had] accessed and acquired certain files from our systems," which after further investigation completed on July 10, 2023 was determined to involve Private Information, *but that*, the information "differ[ed] from individual to individual but may have included" their  names, addresses, dates of birth, Social Security numbers, driver's license or passport numbers, insurance, and other benefits information, such as the names of your dependents and beneficiaries.[50]

75.     In its Data Breach Notice, Group 1001 further stated that they had "scanned our systems for, and remediated, any identified indicators of compromise[;]" and  "deployed additional advanced endpoint detection and monitoring tools on our newly restored systems for an added layer of security and visibility across our network[;]" and would continue to make infrastructure enhancements.[51]

76.     Group 1001's Data Breach Notice encouraged Defendants' Data Breach victims to be "vigilant and closely review and monitor [] financial accounts, statements, credit reports, and other financial information for any evidence of unusual activity, fraudulent charges, or signs of identity theft." [52]

---

[49] *Id*.
[50] *Id*.
[51] *Id*.
[52] *Id*.

77.     Group 1001's Data Breach Notice likewise apprised Data Breach victims of their abilities to put a fraud alert or security freeze on their credit files.[53]

78.     Further, and as with Defendants' other data breach notices, in Group 1001's Data Breach Notice, it offered affected victims two (2) years of identity theft protection services through IDX.[54]

79.     On or about July 28, 2023, Group 1001 posted an updated to its prior Website Notice, to state that:

> Over the past several months, we have been analyzing the impacted files since fully recovering our systems to understand what personal information may be at risk. We have begun the process of notifying the individuals whose personal information is confirmed to have been included. **Impacted individuals will soon be receiving a letter that will explain how to enroll in the following services.**
> […]
> **To help prevent a similar occurrence in the future, we have implemented numerous additional measures designed to enhance the security of our network, systems, and data.**[55]

*iv.     Plaintiffs' and the proposed Class Members' Private Information was unauthorizedly disclosed to third-party cybercriminals in the Data Breach*

80.     Plaintiffs' and the proposed Class Members' Private Information was unauthorizedly disclosed to third-party cybercriminals in Defendants' Data Breach, including their names, addresses, dates of birth, Social Security numbers, contract/policy numbers, as well as their financial account numbers or credit/debit card numbers (in combination with security code, access code, password or pin for the account), and their Driver's License Numbers or Non-Driver Identification Card Numbers ("the Data Breach").[56]

---

[53] *Id.*

[54] *Id.*

[55] Group 1001, "Group 1001 Update on Ransomware Attack," avail. at https://www.group1001.com/news/group-1001-update-on-ransomware-attack (last acc. Aug. 15, 2023) (emphases added).

[56] *See* Clear Spring Notice of Data Breach, Cary Weigand, Exhibit B; Clear Spring Notice of Data Breach, Cheryl Schmidt, Exhibit C; Delaware Life Notice of Data Breach, Calvin Schmidt,

81.     Defendants' conduct, by acts of commission or omission, caused the Data Breach, including: Group 1001's, Clear Spring's and Delaware Life's collective failures to implement best practices and comply with industry standards concerning computer system security to adequately safeguard Private Information, allowing Private Information to be accessed and stolen, by failing to implement security measures that could have prevented, mitigated, or timely detected the Data Breach, by failing to adequately train their customers on cybersecurity policies, enforce those policies, or maintain reasonable security practices and systems; and by Group 1001 failing to supervise its subsidiary companies, Clear Spring and Delaware Life, resulting in the Data Breach.

82.     On information and belief, as more fully articulated below, Plaintiffs' and the members of the proposed Class Members' Private Information, unauthorizedly disclosed to third-party cybercriminals in the Data Breach, has now or will imminently be posted to the Dark Web for public viewing and use, in the public domain, and utilized for criminal purposes and fraudulent misuse.

### C.  Plaintiffs' Experiences

#### i. Plaintiff Weigand

83.     Plaintiff Weigand was a customer of Defendants, having purchased a 10-year annuity from Clear Spring through Elevation Capital in November 2020.

84.     As a condition of receiving Clear Spring's and Group 1001's financial services, Plaintiff Weigand was required to provide said Defendants with her Private Information, including but not limited to her name, address, date of birth, Social Security number, and contract/policy

---

Exhibit D; Clear Spring Data Breach Notification to Maine Attorney General, July 27, 2023, available at https://apps.web.maine.gov/online/aeviewer/ME/40/5f16f55f-42b7-458f-a916-2603c9f83bb7.shtml (last acc. Aug. 15, 2023); Group 1001 Notification to Maine Attorney General, July 28, 2023, avail. at https://apps.web.maine.gov/online/aeviewer/ME/40/fce1bd8e-b164-458e-bb3d-42b5dcaeb0a4.shtml (last acc. Aug. 15, 2023).

number.

85.     In entrusting her Private Information to Clear Spring and Group 1001, Plaintiff Weigand believed that they would adequately safeguard that information, including as set forth in their privacy policies. Had Plaintiff Weigand known that Clear Spring and Group 1001 did not utilize reasonable data security measures, she would not have entrusted her Private Information to said Defendants.

86.     Plaintiff Weigand received Clear Spring's Data Breach Notice dated July 28, 2023 (Ex. B) on August 2, 2023, informing her that her Private Information, including her name, address, date of birth, Social Security number, and contract/policy number were unauthorizedly disclosed to and acquired by cybercriminals in Defendants' Data Breach. *See* Exhibit B.

87.     Plaintiff Weigand enrolled in the identity monitoring services with IDX offered by Defendants.

88.     As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff Weigand has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be posted on the dark web for sale  and used for criminal and fraudulent purposes.

89.     In addition, as a result of the Data Breach, Plaintiff Weigand has been and will be forced to expend considerable time and effort to monitor her accounts and credit files to protect herself from identity theft and fraudulent misuse of her Private Information disclosed in the Data Breach.

90.     Furthermore, Plaintiff Weigand has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of her Private Information in the Data

Breach.

91.     Had Plaintiff Weigand known that Defendants did not adequately protect her Private Information, she would not have entrusted her sensitive Private Information to Clear Spring or Group 1001.

92.     Furthermore, Plaintiffs Weigand's sensitive Private Information remains in Defendants' possession in their computer systems without adequate protection against known threats, exposing her to future breaches and additional harm.

93.     As a result of the Data Breach, Plaintiff Weigand faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like her Social Security number. Accordingly, the identity theft protection which Defendants offered is wholly insufficient to compensate her and the Class Members for their damages resulting therefrom.

### ii. Plaintiff Cheryl Schmidt

94.     Plaintiff Cheryl Schmidt was a customer of Defendants, having purchased an annuity policy from Clear Spring in 2010, and being covered under an annuity with Delaware Life through her husband, Plaintiff Calvin Schmidt..

95.     As a condition of receiving Clear Spring's, Delaware Life's and Group 1001's financial services, Plaintiff Cheryl Schmidt was required to provide said Defendants with her Private Information, including but not limited to her name, address, date of birth, Social Security number, and contract/policy number.

96.     In entrusting her Private Information to Clear Spring, Delaware Life, and Group 1001, Plaintiff Cheryl Schmidt believed that they would adequately safeguard that information, including as set forth in their privacy policies. Had Plaintiff Cheryl Schmidt known that Clear Spring, Delaware Life, and Group 1001 did not utilize reasonable data security measures, she

would not have entrusted her Private Information to Defendants.

97.     Plaintiff Cheryl Schmidt received Clear Spring's Data Breach Notice dated July 28, 2023 in early August 2023, informing her that her Private Information, including her name, address, date of birth, Social Security number, and contract/policy number were unauthorizedly disclosed to and acquired by cybercriminals in Defendants' Data Breach. *See* Exhibit C.

98.     As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff Cheryl Schmidt has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be posted on the dark web for sale  and used for criminal and fraudulent purposes.

99.     In addition, as a result of the Data Breach, Plaintiff Cheryl Schmidt has been and will be forced to expend considerable time and effort to monitor her accounts and credit files to protect herself from identity theft and fraudulent misuse of her Private Information disclosed in the Data Breach.

100.    Furthermore, Plaintiff Cheryl Schmidt has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of her Private Information in the Data Breach.

101.    Had Plaintiff Cheryl Schmidt known that Defendants did not adequately protect her Private Information, she would not have entrusted her sensitive Private Information to Clear Spring, Delaware Life, or Group 1001.

102.    Furthermore, Plaintiffs Cheryl Schmidt's sensitive Private Information remains in Defendants' possession in their computer systems without adequate protection against known threats, exposing her to future breaches and additional harm.

103.    As a result of the Data Breach, Plaintiff Cheryl Schmidt faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like her Social Security number. Accordingly, the identity theft protection which Defendants offered is wholly insufficient to compensate her and the Class Members for their damages resulting therefrom.

### iii. Plaintiff Calvin Schmidt

104.    Plaintiff Calvin Schmidt was a customer of Defendants, having purchased an annuity policy from Clear Spring in 2019, and in June 2020 for his wife, Plaintiff Cheryl Schmidt, and having purchased an annuity from Delaware Life several years ago.

105.    As a condition of receiving Clear Spring's, Delaware Life's and Group 1001's financial services, Plaintiff Calvin Schmidt was required to provide said Defendants with his Private Information, including but not limited to his name, address, date of birth, Social Security number, and contract/policy number.

106.    In entrusting his Private Information to Clear Spring, Delaware Life, and Group 1001, Plaintiff Calvin Schmidt believed that they would adequately safeguard that information, including as set forth in their privacy policies. Had Plaintiff Calvin Schmidt known that Clear Spring, Delaware Life, and Group 1001 did not utilize reasonable data security measures, he would not have entrusted her Private Information to Defendants.

107.    Plaintiff Calvin Schmidt received Delaware Life's Data Breach Notice dated July 28, 2023 in early August 2023, informing him that his Private Information, including his name, address, date of birth, Social Security number, and contract/policy number were unauthorizedly disclosed to and acquired by cybercriminals in Defendants' Data Breach. *See* Exhibit D.

108.    As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff Calvin Schmidt has suffered, and imminently will suffer, injury-in-fact and

damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be posted on the dark web for sale and used for criminal and fraudulent purposes.

109.    In addition, as a result of the Data Breach, Plaintiff Calvin Schmidt has been and will be forced to expend considerable time and effort to monitor his accounts and credit files to protect himself from identity theft and fraudulent misuse of his Private Information disclosed in the Data Breach.

110.    Furthermore, Plaintiff Calvin Schmidt has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information in the Data Breach.

111.    Had Plaintiff Calvin Schmidt known that Defendants did not adequately protect his Private Information, he would not have entrusted his sensitive Private Information to Clear Spring, Delaware Life, or Group 1001.

112.    Furthermore, Plaintiffs Calvin Schmidt's sensitive Private Information remains in Defendants' possession in their computer systems without adequate protection against known threats, exposing him to future breaches and additional harm.

113.    As a result of the Data Breach, Plaintiff Calvin Schmidt faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like his Social Security number. Accordingly, the identity theft protection which Defendants offered is wholly insufficient to compensate her and the Class Members for their damages resulting therefrom.

**D.  This Data Breach was Foreseeable by Defendants.**

114.    Plaintiffs and the proposed Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would

comply with their obligations to keep such information confidential and secure from unauthorized access. By failing to do so, Defendants put all Class Members at risk of identity theft, financial fraud, and other harms.

115.    Defendants tortiously failed to take the necessary precautions required to safeguard and protect the Private Information of Plaintiffs and the Class Members from unauthorized disclosure. Defendants' actions represent a flagrant disregard of Plaintiffs' and the other Class Members' rights.

116.    Plaintiffs and Class members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

117.    Cyber-attacks against financial institutions such as Defendants are targeted and frequent. According to Contrast Security's 2023 report, "Cyber Bank Heists: Threats to the financial sector," "[o]ver the past year, attacks have included banking trojans, ransomware, account takeover, theft of customer data and cybercrime cartels deploying 'trojanized' finance apps to deliver malware in spear-phishing campaigns."[57] In fact, "40% [of financial institutions] have been victimized by a ransomware attack."[58]

118.    According to the Identity Theft Resource Center's January 24, 2022 report for 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security

---

[57]Contrast Security, "Cyber Bank Heists: Threats to the financial sector," pg. 5, avail. at https://www.contrastsecurity.com/hubfs/Cyber%20Bank%20Heists%20Report%202023.pdf?hsLang=en (last acc. Jun 8, 2023).
[58] *Id.,* pg. 15.

numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[59]

119. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Group 1001, Clear Spring, and Delaware Life. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[60]

120. Based on data from the Maine Attorney General, as of August 2022, "…at least 79 financial service companies have reported data breaches affecting 1,000 or more consumers, and the total number of consumers affected by these breaches could be as high as 9.4 million."[61]

121. Private Information/PII is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware and fraudulent misuse, and sale on the Dark Web,

122. Private Information/PII can be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

123. Given the nature of the Data Breach, it was foreseeable that the compromised

---

[59] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last acc. Apr. 14, 2023).
[60] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last acc. Apr. 14, 2023).
[61] Carter Pape, "Breach data from Maine shows scope of bank, credit union exposures," American Banker, August 24, 2022, available at https://www.americanbanker.com/news/breach-data-from-maine-shows-scope-of-bank-credit-union-exposures

Private Information/PII could be used by hackers and cybercriminals in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and the Class Members' PII can easily obtain their tax returns or open fraudulent credit card accounts in the Class Members' names.

### E. Defendants Failed to Comply with FTC Guidelines

124.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

125.    In 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of Private Information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[62]

126.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented

---

[62] *See* Federal Trade Commission, October 2016, "Protecting Private information: A Guide for Business," available at https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf (last acc. Apr. 14, 2023).

reasonable security measures.[63]

127.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

128.     These FTC enforcement actions include actions against entities failing to safeguard Private Information such as Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

129.     Defendants failed to properly implement basic data security practices widely known throughout the industry. Defendants' failures to employ reasonable and appropriate measures to protect against unauthorized access to employee Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

130.     Defendants were at all times fully aware of their obligations to protect the Private Information of its current and former customers and/or employees. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**F.  Defendants Fail to Comply with Industry Standards**

131.     As shown above, experts studying cyber security routinely identify organizations holding Private Information as being particularly vulnerable to cyber-attacks because of the value

---

[63] *See id.*

of the information they collect and maintain. As of 2022, ransomware breaches like that which occurred here had grown by 41% in the last year and cost on average $4.54 million dollars.[64]

132.    A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[65]

133.    In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.

- Use security software to protect data.

- Encrypt sensitive data, at rest and in transit.

- Conduct regular backups of data.

- Update security software regularly, automating those updates if possible.

---

[64] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last acc. Apr. 14, 2023).

[65] *See* https://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. Apr. 14, 2023).

- Have formal policies for safely disposing of electronic files and old devices.

- Train everyone who uses your computers, devices, and network about cybersecurity. You can help customers understand their personal risk in addition to their crucial role in the workplace.[66]

134.    Upon information and belief, Defendants failed to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and other industry standards for protecting Plaintiffs' and the proposed Class Members' Private Information—resulting in the Data Breach.

**G. The Data Breach Caused Plaintiffs and the Class Members Injury and Damages**

135.    Plaintiffs and members of the proposed Class have suffered injury and damages from the unauthorized disclosure of their Private Information in the Data Breach that can be directly traced to Defendants' failures to adequately protect that Private Information, that have occurred, are ongoing, and imminently will occur.

136.    As stated prior, in the Data Breach, unauthorized cybercriminals were able to access the Plaintiffs' and the proposed Class Members' Private Information, which on information and belief is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale, causing widespread injury and damages.

137.    The ramifications of Defendants' failure to keep Plaintiffs' and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and

---

[66] Understanding The NIST Cybersecurity Framework, https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Apr. 14, 2023).

financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

138.    As a direct and proximate result of the Data Breach permitted by Defendants to occur, Plaintiffs and the Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and the Class Members have suffered, are at an increased risk of suffering, or will imminently suffer:

    a.    The loss of the opportunity to control how Private Information is used;

    b.    The diminution in value of their Private Information;

    c.    The compromise and continuing publication of their Private Information;

    d.    Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    e.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    f.    Delay in receipt of tax refund monies;

    g.    Unauthorized use of stolen Private Information; and

    h.    The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fails to undertake the appropriate measures to protect the Private

Information in its possession.

139.     Furthermore, the Data Breach has placed Plaintiffs and the proposed Class Members at an increased risk of fraud and identity theft.

140.     There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.[67]

94.     The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[68]

95.     The time-consuming process recommended by the FTC and other experts is complicated by the vulnerable situations of Defendants' customers.

---

[67] *See* Gaetano DiNardi, Aura.com, "How Bad Is Identity Theft? Is It Serious?" (December 14, 2022) available at https://www.aura.com/learn/dangers-of-identity-theft#:~:text=Fraudsters%20can%20open%20new%20accounts,to%20repair%20your%20credit%20score (last acc. Feb. 27, 2023).

[68] *See* https://www.identitytheft.gov/Steps (last visited September 1, 2021).

96.     Identity thieves use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

97.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

98.     In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Private Information to police during an arrest—resulting in an arrest warrant being issued in the victim's name.

99.     Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage.  Fifty-four percent reported feelings of being violated. [69]

100.     What's more, theft of Private Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, Private Information is a valuable property right.[70]

---

[69] *See* Jason Steele, *Credit Card and ID Theft Statistics*, CreditCards.com (June 11, 2021), avail. at https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ citing Identity Theft Resource Center, "2021 Consumer Aftermath Report," May 26, 2021 available at https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/ (last acc. Feb. 27, 2023).
[70] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally*

102.    The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison sentences. Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that Private Information has considerable market value.

103.    Theft of Private Information, in particular, is problematic because: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[71]

104.    It must also be noted there may be a substantial time lag–measured in years–between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

105.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

106.    Where the most Private Information belonging to Plaintiffs and Class Members was accessible from Defendants' network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

107.    Thus, Plaintiffs and the Class Members must vigilantly monitor their financial and

---

*Identifiable Information ("Private information") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[71] *See Medical Identity Theft, Federal Trade Commission Consumer Information* (last visited: June 7, 2022), http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

medical accounts for many years to come.

108.    Social Security numbers are among the worst kinds of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud.[72]

109.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[73] Each of these fraudulent activities is difficult to detect. An individual may not know that her or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

110.    Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[74]

---

[72] *See* U.S. Social Security Administration, "Identity Theft and Your Social Security Number," Publication No. 05-10064, July 2021, available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last acc. Feb. 25, 2023)

[73] *See id.*

[74] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited September 1, 2021).

111.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[75]

112.    Accordingly, the Data Breach has caused Plaintiffs and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the imminent identity fraud and criminal fraudulent activity; lost time and efforts in remediating the impact of the Data Breach, and other injury and damages as set forth in the preceding paragraphs.

113.    Defendants knew or should have known of these harms which would be caused by the Data Breach it permitted to occur, and strengthened their data systems accordingly.

## CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) of the Federal Rules of Civil Procedure, and Fed. R. Civ. P. 23(b)(3), on behalf of the following proposed class ("the Class"):

**All persons whose Private Information was compromised in Defendants' Data Breach discovered on February 9, 2023, as announced in their notices in July 2023.**

115.    Excluded from the Class are Defendants' officers, directors, and legal representatives and the judges and court personnel in this case and any members of their immediate families.

---

[75] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited September 1, 2021).

116.     This action satisfies the requirements for a class action under Fed. R. Civ. P. 23(a)(1)-(3) and Fed. R. Civ. P. 23(b)(3), including requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority.

117.     <u>Numerosity.</u>  Plaintiffs are representatives of the proposed Class, consisting of over 4,393 individuals, approximately, which are identifiable based on Defendants' records, and far too many to join in a single action.

118.     <u>Commonality.</u> There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

     a.     Whether Defendants failed to adopt the practices and procedures necessary to adequately safeguard the information compromised in the Data Breach;

     b.     Whether Defendants timely, adequately, and accurately informed Class Members that their Private Information had been compromised;

     c.     Whether and to what extent Defendants breached their implied contract with Plaintiffs and the Class;

     d.     Whether Defendants were unjustly enriched;

     e.     Whether Defendants acted negligently;

     f.     Whether Class members are entitled to damages as a result of Defendants' wrongful conduct;

     g.     Whether Plaintiffs and the Class are entitled to restitution as a result of Defendants' wrongful conduct; and

     h.     Whether Plaintiffs and the Class are entitled to injunctive relief.

119.   <u>Typicality.</u> Plaintiffs' claims are typical of those of other Class members because

Plaintiffs' Private Information, like that of every other Class Member, was compromised by the Data Breach. Further, Plaintiffs, like all Class members, were injured by Defendants' uniform misconduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

120.    Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, including data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

121.    Superiority of Class Action. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

122.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting

this lawsuit as a class action.

123.     Adequate notice can be given to Class members directly using information maintained in Defendants' records.

124.     <u>Predominance.</u> Pursuant to Fed. R. Civ. 23(b)(3), the issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include but are not limited to the questions identified above.

125.     This proposed class action does not present any unique management difficulties.

**FIRST CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

126.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

127.     Plaintiffs and Class members were required to provide their Private Information—including their names, addresses, dates of birth, Social Security numbers, and contract/policy numbers and other Private Information—to Defendants as a condition of receiving Clear Spring's, Delaware Life's and Group 1001's financial annuity services, or as a condition of employment.

128.     Implicit in the agreement between Defendants and its customers and/or employees was the obligation that the parties would maintain the Private Information confidentially and securely, including those obligations set forth in Defendants' privacy policies to maintain adequate safeguards to safeguard nonpublic Private Information from unauthorized use or improper access, and in their conduct and other representations.

129.     Defendants had an implied duty of good faith to ensure that the Private Information of Plaintiffs and Class members in their possession was only used only as authorized, such as to render financial annuity services or as a condition of employment.

130.     Defendants had an implied duty to reasonably safeguard and protect the Private Information of Plaintiffs and Class members from unauthorized disclosure or use.

131.     Additionally, Defendants implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

132.     Plaintiffs and Class members fully performed their obligations under the implied contract with Defendants. Defendants did not. Plaintiffs and Class members would not have provided their confidential Private Information to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their Private Information for uses other than Defendants' provision of financial annuity services or as a condition of employment.

133.     Defendants breached the implied contracts with Plaintiffs and Class members by failing to reasonably safeguard and protect Plaintiffs and Class members' Private Information, which was compromised as a result of the Data Breach.

134.     Defendants' acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiffs and Class members to provide their Private Information in exchange for medical treatment and benefits.

135.     As a direct and proximate result of Defendants' breach of its implied contracts with Plaintiffs and Class members, Plaintiffs and Class members have suffered and will imminently suffer injury, including but not limited to: the loss of the opportunity to control how Private Information is used; diminution in value of their Private Information; the compromise and continuing publication of their Private Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the

actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; delay in receipt of tax refund monies; unauthorized use of stolen Private Information; and the continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Private Information in their possession.

**SECOND CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

136.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

137.    This claim is pleaded solely in the alternative to Plaintiffs' implied contract claims.

138.    Plaintiffs and Class Members conferred a monetary benefit upon Defendants in the form of monies paid for financial annuity services, and labor rendered in connection with employment.

139.    Defendants appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

140.    Defendants also benefited from the receipt of Plaintiffs and Class members' Private Information, as this was used to facilitate the provision of financial annuity services and employment.

141.    As a result of Defendants' conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and Class members paid for, or the value of labor rendered, and those without reasonable data privacy and security practices and procedures that they received.

142. Under principals of equity and good conscience, Defendants should not be permitted to retain the money or value of labor belonging to Plaintiffs and Class Members because Defendants failed to implement (or adequately implement) the data privacy and security practices and procedures for which Plaintiffs and Class Members paid, and which were otherwise mandated by federal, state, and local laws and by industry standards.

143. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds it received as a result of its conduct and the Data Breach alleged herein.

### THIRD CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

144. Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

145. Upon agreeing to receive financial annuity services from Defendants or as a condition of employment, Plaintiffs and Class Members were obligated to provide Defendants with certain Private Information, including their names, addresses, dates of birth, Social Security numbers, and contract/policy numbers and other Private Information.

146. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if their Private Information were wrongfully disclosed.

147. Defendants had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendants' policies regarding the storage, utilization, and distribution of customers' and employees' Private Information to ensure that Plaintiffs' and Class Members' Private Information

was adequately secured and protected, including in accordance with industry standards and applicable law.

148.   Private Information is highly valuable, and Defendants knew or should have known the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiffs and the Class as well as the importance of exercising reasonable care in handling it.

149.   The risk that unauthorized persons would try to gain access and misuse to the Private Information stored on Defendants' systems was foreseeable.

150.   Defendants had a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendants' failures to adequately safeguard their Private Information in accordance with state-of-the-art industry standards for data security would result in the compromise of that Private Information —just like the Data Breach that ultimately came to pass. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' Private Information by disclosing and allowing access to Private Information to unknown third parties and by failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for data security.

151.   Defendants owed Plaintiffs and Class Members a duty to notify them within a reasonable time frame of any breach to the security of their Private Information. Defendants also owed Plaintiffs and Class members a duty to timely and accurately disclose to them the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiffs and Class members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

152.   Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that Private Information. Defendants also knew or should have known that it had inadequate employee training and education and information security protocols in place to secure the Private Information of Plaintiffs and the Class.

153.   Defendants' conduct created a foreseeable risk of harm to Plaintiffs and Class Members.

154.   Defendants' misconduct included, but was not limited to, its failure to take the steps necessary to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decision not to comply with industry standards for the safekeeping and use of the Private Information of Plaintiffs and Class Members.

155.   Plaintiffs and Class Members had no ability to protect their Private Information that was in Defendants' possession. Only Defendants were able to protect against the harm Plaintiffs and Class members suffered as a result of the Data Breach.

156.   Defendants had and continue to have a duty to adequately notify Plaintiffs and Class Members that their Private Information was compromised, how it was compromised, and other details of the Data Breach. Such notice is necessary to allow Plaintiffs and the Class members to take steps to prevent, mitigate, and repair any identity theft or fraudulent use of their Private Information by unauthorized third parties.

157.   Defendants has failed to timely or adequately notify Plaintiffs and the Class of the Data Breach, as the Data Breach Notice(s) did not contain sufficient information detailing the incident, including, but not limited to, key information regarding the nature of the

hacking/ransomware attack and how the unauthorized third party obtained access to Plaintiffs and Class members' Private Information. Defendants' failures to provide appropriate notice of the Data Breach to Plaintiffs and Class members actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class members' injuries in fact.

158.   Defendants had a duty to have appropriate procedures in place to prevent the unauthorized dissemination of the Private Information of Plaintiffs and Class Members.

159.   Defendants have admitted that the privacy and security of Plaintiffs' and Class members' Private Information was compromised as a result of the Data Breach.

160.   Defendants, through their acts and/or omissions, unlawfully breached their respective duties to Plaintiffs and the Class by failing to exercise reasonable care in protecting and safeguarding their Private Information.

161.   Defendants deviated from standard industry rules, regulations, and practices at the time of the Data Breach by improperly and inadequately safeguarding the Plaintiffs' and Class Members' Private Information.

162.   Defendants, through their acts and/or omissions, unlawfully breached their duties to Plaintiffs and the Class by failing to have appropriate procedures in place to store and access customers' and/or employees' Private Information and to detect and prevent unauthorized access to their Private Information.

163.   Defendants, through their acts and/or omissions, unlawfully breached their duties to timely and adequately disclose to Plaintiffs and Class members the existence and scope of the Data Breach.

164.   But for Defendants' wrongful and negligent breach of these duties, Plaintiffs and Class Members' Private Information would not have been compromised.

165.   There is a close causal connection between Defendants' failures to implement security measures to protect the Private Information entrusted to them and the risk of imminent harm suffered by Plaintiffs and the Class.

166.   As a result of Defendants' negligence, Plaintiffs and the Class Members have suffered and will imminently suffer injury, including but not limited to: the loss of the opportunity to control how Private Information is used; diminution in value of their Private Information; the compromise and continuing publication of their Private Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; delay in receipt of tax refund monies; unauthorized use of stolen Private Information; and the continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Private Information in their possession.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

167.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

168.   Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' Private Information.

169.   The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs and Class Members' sensitive Private

Information. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect customers or, in this case, fund participants and customers' Private Information.

170.     Defendants violated their duties under Section 5 of the FTC Act by failing to use reasonable measures to protect their customers' and employees' Private Information and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendants had collected and stored and the foreseeable consequences of a data breach, including the immense damages that would result to its customers and employees in the event of a breach, which ultimately came to pass.

171.     The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

172.     Defendants had a duty to Plaintiffs and the Class to implement and maintain reasonable security procedures and practices to safeguard their Private Information.

173.     Defendants breached their duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' Private Information.

174.     Defendants' violations of Section 5 of the FTC Act and their failures to comply with applicable laws and regulations constitute negligence *per se*.

175.     But for Defendants' wrongful and negligent breach of the duties owed to Plaintiffs

and Class Members, Plaintiffs and Class Members would not have been injured.

176.    The injury and harm suffered by Plaintiffs and Class Members were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that their breach would cause Plaintiffs and the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

177.    Had Plaintiffs and Class Members known that Defendants did not adequately protect the Private Information entrusted to them, Plaintiffs and Class Members would not have entrusted Defendants with their Private Information.

178.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class Members have suffered and will imminently suffer injury, including but not limited to: the loss of the opportunity to control how Private Information is used; diminution in value of their Private Information; the compromise and continuing publication of their Private Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; delay in receipt of tax refund monies; unauthorized use of stolen Private Information; and the continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Private Information in their possession.

**FIFTH CAUSE OF ACTION**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Class)**

179.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

180.    Indiana recognizes the Restatement (Second) of Torts formulation of invasion of privacy, consisting of the distinct injuries: (1) intrusion upon seclusion; (2) appropriation of likeness; (3) public disclosure of private facts; and (4) false light publicity. Herein, Plaintiffs proceed upon the third injury—public disclosure of private facts.

181.    Plaintiffs' and Class Members' Private Information is private in nature.

182.    Defendants disclosed Plaintiffs' and Class Members' Private Information to the public via the Data Breach, as on information and belief the information has been publicized it on the Dark Web and elsewhere for criminal and fraudulent purposes.

183.    The disclosure of Plaintiffs' and Class Members' Private Information, including Social Security numbers would be highly offensive to a reasonable person.

184.    The Private Information is not of legitimate public concern.

185.    As a direct and proximate result of Defendants' actions alleged above, Plaintiffs and Class Members have suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs, CAREY WEIGAND, CHERYL SCHMIDT and CALVIN SCHMIDT, on behalf of themselves and all others similarly situated, request the following relief:

A.    An Order certifying this action as a class action and appointing Plaintiffs as Class representatives and the undersigned as Class counsel;

B.    An award of compensatory and actual damages, as well as punitive damages, in an amount to be determined;

C.    A mandatory injunction directing Defendants to adequately safeguard the Private Information of Plaintiffs and the Class hereinafter by implementing improved security procedures and measures;

D.   A mandatory injunction requiring that Defendants provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of Private Information to unauthorized persons;

E.   An award of attorneys' fees and costs;

F.   An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law; and

G.   Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury under Fed. R. Civ. Proc. 38(b) on all claims so triable.

Dated: August 16, 2023                Respectfully submitted,

*s/ Lynn A. Toops*
Lynn A. Toops (No. 26386-49)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481
(317) 636-2593 (facsimile)
ltoops@cohenandmalad.com

*Counsel for the Plaintiffs and the Proposed Class*