UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CARY WEIGAND, CHERYL SCHMIDT and CALVIN SCHMIDT, individually, and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:23-cv-01452-RLY-TAB |
| GROUP 1001 INSURANCE HOLDINGS, LLC; GROUP 1001 RESOURCES, LLC; CLEAR SPRING LIFE AND ANNUITY COMPANY; and DELAWARE LIFE INSURANCE COMPANY, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

### INTRODUCTION

The Court should "preliminarily" approve the parties' $4.75 million settlement as "fair, adequate, and reasonable" because plaintiffs achieved what they set out to accomplish with this case. In July 2023, plaintiffs and the class received letters notifying them that their information had been compromised in a data breach by cybercriminals. The letter was from Group 1001, an insurance holding company whose subsidiaries sold insurance and annuity policies to plaintiffs and the class. When buying the policies, Group 1001 required customers like plaintiffs to disclose information running the gamut on their identities, including their names, dates of birth, Social Security and "financial account" numbers, passport numbers, and who their beneficiaries were. In other words, the breach compromised all the data needed to commit identity theft and fraud.

Plaintiffs sued Group 1001 and its subsidiaries alleging they failed to protect the class's "personally identifiable information" despite their duties to do so under state and federal law, impacting around 475,947 class members. As relief, plaintiffs demanded that defendants

1

compensate the class for their losses, protect their data and identities from fraud, and pay the costs required to deliver that relief. And with the parties' settlement, plaintiffs have achieved just that, establishing a $4.75 million common fund that will pay for the relief plaintiffs demanded.

That relief includes three benefits. First, the fund will pay for three years' credit monitoring and identity theft services with $1 million in fraud insurance for all class members who claim it. This will help class members stop fraud from happening and ensure they have insurance to cover it if it does. Second, class members can claim their "out-of-pocket" losses and lost time resulting from the breach. That includes any time spent dealing with the breach, up to four hours at $25 per hour, or losses like fraud related to the breach up to $5,000. And third, all class members can claim cash payments from the fund no matter whether they suffered losses from the breach. Those payments will be paid "pro rata" from the fund depending on how many class members claim benefits but guarantees them $5 at minimum.

These benefits exceed those found in other data breach cases and resulted from an arm's length mediation with a mediator experienced in resolving data breach cases, Bruce Friedman from JAMS. In February 2024, Mr. Friedman brokered a framework for settling that the parties refined into the settlement agreement. Before agreeing to mediate, plaintiffs conditioned participating on receiving informal discovery from Group 1001, and Group 1001 provided that information, ensuring plaintiffs understood the landscape affecting settlement when negotiating the above terms.

As a result, the Court should "preliminarily" approve the settlement and certify the class for settlement purposes under Rule 23. In so doing, the Court should appoint plaintiffs as class representatives, their attorneys as class counsel, and order the parties to notify the class about settlement under the agreement's notice program.

## BACKGROUND FACTS

### I.    Plaintiffs' claims

Group 1001 is an insurance holding company including subsidiaries like Clear Spring Life and Annuity Company and Delaware Life Insurance Company. Doc. 1 ("Compl.") ¶ 4. To buy policies and annuities from Group 1001's companies, defendants require customers to disclose their "personally identifiable information" ("PII"). *Id.* ¶ 5. And that PII includes everything from customer names and addresses to Social Security and financial account numbers. *Id.* ¶ 31. Because this information is "sensitive," Group 1001 promised to protect it. *Id.* ¶ 34. Even so, plaintiffs allege defendants never implemented the security systems needed to fulfill those commitments, leading to a data breach. *Id.* ¶ 81

Between November 2022 and February 2023, cybercriminals accessed the PII belonging to plaintiffs and the class in a ransomware attack. *Id.* ¶ 47. Group 1001 described the breach as a "sophisticated ransomware" attack on its "technology infrastructure." *Id.* ¶ 50. That caused defendants to disconnect their systems from their network to contain the breach and retain "forensic experts" to determine how it happened. *Id.* ¶ 51. They each notified their customers about the breach, issuing their own breach notices describing the event and the PII it compromised. *See generally id.* In each notice, defendants promised they had implemented systems to "prevent a similar occurrence [from happening] in the future." *Id.* ¶ 79.

Plaintiffs Weigand and the Schmidts are Group 1001 customers, doing business with Clear Spring and Delaware Life. *Id.* ¶¶ 84-110. They each received defendants' breach notices informing them on how the incident impacted their data. *See id.* ¶¶ 83-113. Although defendants offered plaintiffs credit monitoring for two years, plaintiffs allege that was not enough to compensate them and the class for their losses. *Id.* As a result, plaintiffs sued defendants under five counts, asserting defendants violated their duties to protect the class's data under contract, tort, and statutory

principles. *Id*. ¶¶ 126-185. And as relief, plaintiffs demanded that defendants compensate the class for its losses and protect their identities. *Id*. Prayer for Relief.

## II.    Mediation

In October 2023, defendants moved to dismiss plaintiffs' complaint on two grounds—arguing they lacked standing and had not stated claims under any theory. Doc. 24. Plaintiffs prepared to resist the motion under Seventh Circuit precedent, but acknowledged the case would face risks even if they prevailed at that stage. Joint Declaration in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement ("Joint Decl.") ¶ 2. Defendants also recognized the risks that litigation posed, including the liability, cost, and delay it would cause. *Id*. As a result, the parties considered mediating the matter to avoid those risks. *Id*.

But before plaintiffs agreed to mediate, they conditioned their participation on receiving "informal" discovery first, including the "post-breach forensic report" detailing the data breach. *Id*. ¶ 3. That effort confirmed how the breach happened, what it impacted, and how many class members it affected— 475,947. *Id*. Armed with this information, plaintiffs agreed to mediate with Bruce Friedman, a mediator experienced in negotiating data breach class actions. *Id*.

At mediation, the parties advocated for their positions, discussing each side's strengths and weaknesses and the risks they faced if they did not settle. *Id*. ¶ 4. To avoid any conflict with the class, the parties did not negotiate or discuss any terms affecting attorney fees and service awards before negotiating the agreement's core terms, including the relief it would provide the class and how the parties would distribute it. *Id*. Indeed, the parties agreed plaintiffs would need to petition the Court before receiving attorney fees and service awards, and did not condition a settlement on plaintiffs receiving any specified amounts. *Id*. These efforts paid off, resulting in the settlement plaintiffs describe below.

**III.    Settlement terms**

i.    <u>Class definition</u>

The settlement agreement defines the class as: "All individuals whose personal information may have been compromised as a result of the Data Incident, as identified on the Class List." Settlement Agreement, Key Terms. The parties estimate that class includes 475,947 members. *Id*.

ii.    <u>Settlement benefits</u>

The settlement achieves plaintiffs' goals, compensating the class for their losses and protecting their identities. If approved, defendants will pay for those benefits with a $4.75 million settlement fund. *Id*. And as a "key term," the agreement confirms defendants will pay that amount "with no reversion to the Defendants," meaning they will pay every cent. *Id*.

The settlement will benefit class members in three ways. First, it provides class members credit monitoring and identity theft services with $1 million in fraud insurance. *Id*. § 3.2.1. Class members need only complete the claim form to receive this benefit, entitling them to three years of protection under three-bureau monitoring. *Id*.

Second, class members can claim their "out-of-pocket" losses and lost time. *Id*. §§ 3.2.2.-3.2.3. Out-of-pocket losses include bank fees, fees for credit reports, credit insurance, and any "actual fraud" suffered following the data breach. *Id*. To claim these benefits, class members need only show their loss was "fairly traceable" to the incident. *Id*. For lost time, class members can claim up to four hours of "time spent acquiring credit freezes, remedying actual fraud, monitoring statements, etc." *Id*. Like out-of-pocket losses, class members need only validate the loss on their claim form. *Id*.

And third, class members can claim a cash payment from the settlement no matter their losses. *Id*. § 3.2.4. In fact, members can claim the benefit "whether or not [the] Class Member also submits a claim for Identity Theft Protection Services, Out-of-Pocket Losses, or Lost Time." *Id*.

To that end, the fund will pay all claims pro rata, dividing the fund "by the number of valid claimants." *Id*. That number will vary depending on how many claims the parties receive, but the cash payments will be $5, at minimum, and are likely to be much higher. *Id*. This ensures that all class members can claim a benefit without needing to qualify for "actual" losses.

    iii.    <u>Notice program, claims, objections, and opt-outs</u>

The settlement identifies "Kroll Settlement Administration LLC" as the administrator that will notify the class and administer benefits. *Id*. Starting with notice, the settlement requires defendants to provide Kroll a class list "with information sufficient for [Kroll] to mail each member of the Settlement Class" a notice. *Id*. § 6.2. With that information, Kroll will notify class members and direct them to claim benefits either online or by mail. *Id*. § 6.3. On the settlement website, Kroll will link all case documents at issue, including the complaint, the settlement agreement, and this Motion. *Id*. If any notice is "returned as undeliverable," Kroll will either mail it to the forwarding address identified or run a skip trace to find an alternative. *Id*.

Once received, class members can claim benefits by completing the form. *Id*. § 4. The form is written in "plain English," allowing class members to select the benefits that apply to them and verify their status as claimants. *Id*. So long as claimants submit the form by the claims deadline, Kroll will process them as "valid, invalid, or deficient" with a chance for class members to cure any deficiencies. *Id*. ¶ 4.3. Assuming the Court approves the settlement, Kroll will then pay all claims it approved within the "Deadline to Pay Valid Claims." *Id*. § 4.4.

If a class member reviews the settlement and objects to its terms, the agreement informs them on how to record their objection with the Court. *Id*. § 6.5; Ex. B. To do so, an objector need only identify themselves, the case, the grounds for their objection, their counsel, their witnesses, and whether they will appear at the final approval hearing. *Id*. Class members can otherwise opt

out to exclude themselves from the agreement and preserve their right to sue. *Id*. § 6.4. To do so, they need only identify themselves and "state unequivocally [their] intent to be excluded from the Agreement" by the deadline. *Id*; Ex. B.

iv.    Release and termination

In exchange for the settlement's benefits, the class will release defendants from all claims under plaintiffs' complaint. *Id*. § 5. But the parties tailored the release to apply only to claims "arising out of or in any way related to the Data Incident[.]" *Id*. This means class members will preserve any claims they may otherwise have against defendants. *Id*. Otherwise, only class members who opt out from the settlement will avoid its release. *Id*.

Under § 9, the parties define when the agreement may terminate, including if the Court denies this Motion or to approve the settlement at any stage. If the Court declines to approve the settlement, it will terminate and restore "the *status quo ante* in the Litigation." *Id*. And if "more than 500 members out-out," defendants shall have the option to terminate, again returning the parties to the *status quo ante*. *Id*. In that event, defendants shall pay Kroll any costs it incurred, but the settlement fund shall otherwise return to defendants. *Id*.

v.    Attorney fees & service awards

As discussed above, the parties did not negotiate attorney fees or service awards until they agreed on the terms benefiting the class. Joint Decl. ¶ 4. And they negotiated only the right to *request* attorney fees, not a guarantee that they must receive any specified amount from the Court. Settlement Agreement § 7. That includes the right to request one-third from the fund for fees, after deducting all costs and expenses to administer the settlement, and $5,000 as service awards for each plaintiff. *Id*., Key Terms. The parties will notify the class about these proposed terms and class members will have the chance to object to them by the objection deadline. *Id*. §§ 6.5, 7.

## ARGUMENT

Courts approve class action settlements under Rule 23. Fed. R. Civ. P. 23. That "entails a three-step process." *Probst v. Eli Lilly & Co. Lilly USA LLC*, No. 1:22-cv-01986-MKK-SEB, 2023 U.S. Dist. LEXIS 237168, at *3 (S.D. Ind. Nov. 21, 2023). First, the Court must "preliminarily approve" the settlement as "likely" to be approved under Rule 23. *Id*. Second, the parties must then notify the class about the settlement's terms. *Id*. And third, the Court then "holds a fairness hearing" to approve the settlement "for good." *Id*.

At the first step, the Court "is not conducting a deep, searching investigation into the settlement." *Id*. Instead, it is reviewing the settlement to determine whether is "within the range of possible approval." *Edwards v. Educ. Mgmt. Corp.*, No. 1:18-cv-03170-RLY-DLP, 2022 WL 3213277, at *2 (S.D. Ind. June 13, 2022) (quoting *Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980)). And, if the class has not been certified yet, the Court must "conditionally" certify it for settlement purposes. *Edwards*, 2022 WL 3213277. In other words, the Court need not find plaintiffs have satisfied every factor below for it to grant plaintiffs' motion. It need only find that approval is "likely." Because plaintiffs exceed that standard, the Court should grant their motion and order the parties to notify the class about settlement.

## I. The Court should certify the class for settlement purposes

To start, the Court should certify the class for settlement purposes. The settlement agreement defines the class as "[a]ll individuals whose personal information may have been compromised as a result of the Data Incident, as identified on the Class List." Settlement Agreement, Key Terms. This class qualifies for certification under Rule 23 because plaintiffs satisfy Rule 23's numerosity, commonality, typicality, adequacy, superiority, and predominance standards, as explained below.

8

i.    <u>Numerosity</u>

The class satisfies this requirement because the class is "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23. When evaluating "numerosity," the Court may rely on its "common sense" to decide what is "numerous." Probst, 2023 U.S. Dist. LEXIS 237168, at *5. Under that standard, even 40 class members is "often regarded as sufficient." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017). Thus, with around 470,000 class members here, plaintiffs satisfy this factor.

ii.    <u>Commonality & typicality</u>

Plaintiffs satisfy the commonality and typicality requirements because they assert a "common contention"—that defendants violated their duties to the class, leading to a data breach that harmed them. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 338, 131 S. Ct. 2541, 2545 (2011). Courts explain the commonality and typicality factors "tend to merge" because they rely on a similar analysis—whether plaintiffs and the class have the same claims based on the same facts. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982); *Palmer v. Combined Ins. Co. of Am.*, 217 F.R.D. 430, 437 (N.D. Ill. 2003) (the typicality "inquiry is closely related to commonality"). Those conditions exist here and are "capable of class wide resolution" because the facts at issue in plaintiffs' complaint give "rise to the claims of other class members and [are] based on the same legal theory." *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 866 (7th Cir. 2018).

Courts in this Circuit do not struggle to apply these concepts to breach cases. For example, in *Yvonne Mart Fox v. Iowa Health Sys.*, the court found "[p]laintiffs' claims involve many common questions, including whether [defendant] was contractually obliged to protect Class members' data, whether [defendant] failed to take reasonable measures to protect that data,

whether the data breaches were caused by such failures, and whether Class members are entitled to relief because of the data breaches." No. 3:18-cv-00327-JDP, 2021 U.S. Dist. LEXIS 40640, at *6 (W.D. Wis. Mar. 4, 2021). So, too, here. Whether defendants had a duty to protect plaintiffs' PII, whether they breached that duty, whether that the breach harmed plaintiffs, and what plaintiffs can demand for relief are questions "common" to the class. Nothing suggests plaintiffs have "individualized" issues that would prevent finding commonality here; indeed, plaintiffs request to be representatives because their facts and claims *mirror* the class's facts and claims. Any "factual differences" between their experiences "will not preclude certification," as "the similarity of legal theory is more important than factual similarity." *Palmer v. Combined Ins. Co. of Am.*, 217 F.R.D. 430, 437 (N.D. Ill. 2003).

      As a result, the Court should find plaintiffs have satisfied these factors.

    iii.   <u>Adequacy</u>

      The Court may also certify the class because plaintiffs and their counsel are "adequate." Fed. R. Civ. P. 23 (requiring that "the representative parties will fairly and adequately protect the interests of the class"). This analysis questions whether plaintiffs have any "possible conflict of interest" with the class and their counsel's ability to "adequately represent the class." *Probst*, 2023 U.S. Dist. LEXIS 237168, at *6.

      There is no evidence plaintiffs' interests conflict with the class's, nor do the facts suggest there would be. Quite the opposite. Plaintiffs seek the same relief as the class based on the same facts. That plaintiffs also seek service awards for themselves does not change the analysis, as the settlement does not guarantee them, and the awards are meant to compensate plaintiffs for their service to the class, not as damages above what other class members will receive. *Scott v. Dart*, No. 23-1312, 2024 U.S. App. LEXIS 10305, at 11-12 (7th Cir. Apr. 29, 2024) ("incentive awards

are designed to compensate named plaintiffs for the costs incurred in performing their role as class representatives—costs above and beyond what they would bear as ordinary class members"). And plaintiffs' counsel's supporting declaration shows plaintiffs' counsel are "adequate" based on their qualifications and experience, including the dozens of data breach cases they have filed, litigated, and settled across the country. *See* Joint Dec. ¶¶ 13–17. As a result, the Court should find plaintiffs and their attorneys are "adequate."

    iv.   <u>Superiority & predominance</u>

Last, plaintiffs satisfy Rule 23(b) because class proceedings would avoid "inconsistent or varying adjudications" and on issues that predominate over "individualized" issues. Fed. R. Civ. P. 23(b). Like class members in other data breach cases, those here "have an interest in efficiently resolving their claims, which a class action and the proposed settlement provide." *Fox*, 2021 U.S. Dist. LEXIS 40640, at \*8. If this case did not proceed as a class action, class members would need to pursue their own claims, defeating efficiency and leading to varying judgments on the merits. Thus, the class device is "superior" here because it aggregates "many relatively small-value individual claims into one case." *In re Harvey*, No. 2023 U.S. Dist. LEXIS 79391. And splitting those claims up would not serve the class's interests when their "common" issues predominate. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("predominance requirement is satisfied when common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication"). In other words, efficiency and justice dictate that this case should proceed as a class action.

As a result, the Court should find plaintiffs have satisfied Rule 23(a) and (b) and certify the class.

## II.    The Court should "preliminarily" approve the settlement as "fair, adequate, and reasonable."

After certifying the class, the Court should preliminarily approve the parties' settlement as "fair, reasonable, and adequate." Again, the Court need not conduct "a deep, searching investigation" at this stage because Rule 23 does not require it. *Probst*, 2023 U.S. Dist. LEXIS 237168, at *3. Rather, when preliminarily approving a "proposed" settlement, the Court need only find the Court will "likely" approve it after ordering the parties to notify the class. Fed. R. Civ. P. 23 (explaining that notice is "justified" if the court will "likely" approve the settlement).

That likelihood considers six factors under Seventh Circuit caselaw. *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014). They are the "strength of plaintiff's case," the case's complexity, any opposition to the settlement, counsel's opinion, and the "stage of proceedings." *Id*. Rule 23 also articulates four factors for approval: whether plaintiffs "adequately" represented the class, whether the proposal was "negotiated at arm's length," the relief provided, and whether the relief is distributed "equitably." Fed. R. Civ. P. 23. Because the *Wong* and Rule 23 factors "overlap" with one another, plaintiffs consolidate their analysis below. *Berglund v. Matthews Senior Hous. LLC*, No. 21-cv-108-pp, 2024 U.S. Dist. LEXIS 32044, at *4 (E.D. Wis. Feb. 26, 2024) (Rule 23's "considerations overlap with the factors articulated by the Seventh Circuit").

### i.    Adequate representation & counsel's opinion

As explained above, plaintiffs and their counsel have "adequately" represented the class—securing a settlement that accomplishes what they set out to achieve with this case. There are no "conflicting interests" between plaintiffs, their counsel, and the class, and there is "no reason to doubt the performance of counsel" or their clients. *Probst*, 2023 U.S. Dist. LEXIS 237168, at *9. Under conditions like this—with experienced counsel recommending the settlement—courts

approve settlements even when the parties reach them after "minimal litigation[.]" *Id*. In fact, plaintiffs' counsel conditioned mediation on "obtain[ing] sufficient written discovery to evaluate and value the claims at issue," ensuring plaintiffs had the information needed to negotiate an "adequate" settlement for the class. *Id*. Armed with that information and counsel's experience, plaintiffs negotiated a $4.75 million settlement that delivers the relief they wanted when they filed this case. This is not to mention that counsel have represented data breach victims across the country and reached settlements that courts routinely approve, meaning the Court should give weight to their opinion approving of this settlement. *Wong*, 773 F.3d 859, 863 (considering the "opinion of competent counsel").

In other words, this factor favors approval for the same reason plaintiffs satisfy the adequacy factor for class certification. Under either analysis, plaintiffs have established their "adequacy."

ii.    <u>Arm's length negotiations</u>

The Court should approve the settlement in the "normal" course because the parties reached it at arm's length. *Burkholder v. City of Fort Wayne*, 750 F. Supp. 2d 990, 995 (N.D. Ind. 2010) ("Normally, a settlement is approved where it is the result of 'contentious arm's-length negotiations, which were undertaken in good faith by counsel") (citations and quotations omitted). That is the case here, as the settlement was "reached because of serious and non-collusive, arm's-length negotiations, with both sides represented by experienced counsel familiar with the applicable facts and law." *In re Harvey*, 2023 U.S. Dist. LEXIS 79391, at 7; *See* Joint Decl. ¶¶ 3–4. Indeed, the Seventh Circuit holds that negotiation is at "arm's length" when the settlement was "proposed by an experienced third-party mediator" like the settlement here. *Wong*, 773 F.3d 859,

864. Nothing otherwise suggests the parties subverted the mediator and "colluded" on the result; indeed, the results show the opposite given the benefits they secure.

As a result, this factor favors approval.

iii.    The relief secured under the circumstances

Plaintiffs settled this case despite the risks it presented, achieving benefits that exceed those found in other data breach cases. Rule 23(e) requires the Court to "take into account" the "costs, risks, and delay of trial and appeal," how the settlement distributes benefits, the proposed attorneys' fees, and any "side" agreements when evaluating this factor. The Rule's counterpart factor under caselaw holds that the "strength of plaintiff's case" is the "most important factor" when approving a settlement. *Adams v. Aztar Ind. Gaming Co.*, No. 3:20-cv-00143-MPB-RLY, 2023 U.S. Dist. LEXIS 33079, at *11 (S.D. Ind. Feb. 24, 2023).

This factor favors the parties' agreement given its benefits it delivers under the circumstances. Plaintiffs sued defendants to compensate the class for its losses and protect their PII following the breach, and the settlement achieves just that. With credit monitoring and identity theft insurance, class members can mitigate the harm the breach may cause. And if they suffered harm, the settlement entitles them to claim their "out-of-pocket" losses and time lost. This is not to mention all class members can claim cash benefits even if they suffered no harm.

These benefits stand out when putting them in context. *See Hammond v. The Bank of N.Y. Mellon Corp.*, 2010 WL 2643307, at 1 (S.D.N.Y. June 25, 2010) (collecting data breach cases dismissed at the Rule 12(b)(6) or Rule 56 stage). Even as courts have allowed data breach cases to proceed past the motion to dismiss stage, they have not settled on when litigants can certify classes or survive summary judgment. As one federal district court observed when approving a settlement with similar class relief: "Data breach litigation is evolving; there is no guarantee of the ultimate

14

result." *Fox*, 2021 WL 826741, at *5 (W.D. Wis. Mar. 4, 2021) (citing *Gordon v. Chipotle Mexican Grill, Inc.*, No. 17-cv-01415-CMA-SKC, 2019 WL 6972701, at *1 (D. Colo. Dec. 16, 2019)). Given this litigation environment, the results achieved here render settlement "reasonable" under all standards.

This is not to mention the settlement delivers relief now, rather than years from now. *In re Harvey*, 2023 U.S. Dist. LEXIS 79391, at *7 (favoring settlement when "t]he costs, risks, and delays of trial and appeal could've delayed any recovery for several years and would have risked the class recovering nothing had this court or an appellate court ruled against them[.]"). Not even winning at trial guarantees victory, rendering the settlement a victory in its own right. *Adams*, 2023 U.S. Dist. LEXIS 33079, at *11 ("The most obvious risk is if Plaintiff is not successful on her claims. Even if successful on the merits at some future time, a future victory is not as valuable as a present victory.").

Plaintiffs' attorney fee request is also "within the range of approval" because it requests one-third of the fund. *Id*. at *10 (S.D. Ind. Feb. 24, 2023) ("courts in this district and around the Seventh Circuit routinely award one-third of the common fund"). In fact, "[t]he typical contingent fee is between 33 and 40 percent[.]" *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998). Thus, plaintiffs' request is "within the range of likely approval" and the Court will decide it after plaintiffs' petition for fees in any event.

As a result, this factor favors approving the settlement.

iv.    <u>Equitable treatment</u>

Last, the Court reviews the settlement for equity. When evaluating this factor, courts allow the parties to distribute benefits according to a class member's loss. *Adams*, No. 2023 U.S. Dist. LEXIS 33079, at *9 ("members will receive their pro rata portion of the allocation based on their

individual damage figured compared to the total damage amount"). Indeed, when class members receive benefits "pro rata," that favors finding equity in the settlement. *Probst*, 2023 U.S. Dist. LEXIS 237168, at *13 ("pro rata distribution of settlement fund indicates equal treatment") (citing *T.K. v. Bytedance Tech. Co.*, No. 19-CV-7915, 2022 U.S. Dist. LEXIS 65322, at *32 (N.D. Ill. Mar. 25, 2022)). In other words, benefits need be "equal" to be "equitable"—allowing plaintiffs to award benefits according to a class member's loss.

Under this principle, the Court should find the settlement is "equitable" under Rule 23. It guarantees class members a right to claim their "out-of-pocket" losses and lost time, a benefit meant to "equitably" acknowledge that some class members experienced "actual" harm resulting from the breach while others did not. But, in any event, *all* class members can claim the cash benefit no matter their losses, and receive it "pro rata," assuring "equitable" treatment for all class members. As a result, the Court should find plaintiffs have satisfied this factor.

## III.    The Court should approve the notice program

After the Court preliminarily approves the settlement and certifies the class, it "must direct notice in a reasonable manner to all class members" to inform them about the proposed settlement. Fed. R. Civ. P. 23(e)(1)(B). Class members are entitled to the "best notice that is practicable under the circumstances" of any proposed settlement before it is finally approved by the Court. *Id*. "The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." *Id*. To comply with due process, notice must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997). Notice must explain: (i) the action; (ii) how the class is defined; (iii) the class claims, issues, or defenses; (iv) that a class member appear through an attorney; (v) that the court will exclude from the class any member

who requests it; (vi) the time and manner for requesting exclusion; and (vii) the binding effect that class judgment has on members. Fed. R. Civ. P. 23(c)(2)(B).

Courts recognize mail notice is often the "best notice practicable to the class." *In re Harvey*, 2023 U.S. Dist. LEXIS 79391, at *16. Even just one mailer may constitute "the best notice practicable under the circumstances," satisfying "the notice requirements of Rule 23" and "the due-process requirement as well." *Vassalle v. Midland Funding, LLC*, No. 3:11-cv-00096, 2014 U.S. Dist. LEXIS 146543, 2014 WL 5162380, at 11 (N.D. Ohio Oct. 14, 2014). So long as the notices "clearly and concisely state in plain, easily understood language" the settlement's terms, the Court may approve them. *Id*.

Here, the notice program relies on data supplied by defendants with class member addresses. Because these class members are defendants' customers and employees, that data is reliable and will lead to the "best practicable" notice under the circumstances. Even if a notice is "returned undeliverable," Kroll will re-send the notice and skip trace an address if needed. As a result, the program satisfies Rule 23, and the Court should approve it.

## CONCLUSION

For these reasons, the Court should grant plaintiffs' motion and order the parties to notify the class about settlement.

Dated: May 8, 2024

Lynn A. Toops
Amina Thomas
Emily D. Kopp
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN  46204
Telephone:  (317) 636-6481
Facsimile:  (317) 636-2593
ltoops@cohenandmalad.com

Raina C. Borrelli, *pro hac vice*
STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611

J. Gerard Stranch, IV, *pro hac vice*
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203

*Counsel for Plaintiffs*